IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SHIRLEY S. ABRAHAMSON,
JOSEPH P. HEIM, DAVID PERKINS,
JOHN V. LIEN, MARILYN WITTRY, and
HILDE ADLER,

                                                    OPINION & ORDER

                    Plaintiffs,

        v.                                          15-cv-211-jdp

SCOTT NEITZEL, in his official capacity as
Secretary of the Wisconsin Department of Administration,
WISCONSIN DEPARTMENT OF ADMINISTRATION,
ANN WALSH BRADLEY, in her official capacity as
a justice of the Wisconsin Supreme Court,
N. PATRICK CROOKS, in his official capacity as
a justice of the Wisconsin Supreme Court,
MICHAEL J. GABLEMAN, in his official capacity as
a justice of the Wisconsin Supreme Court,
DAVID T. PROSSER, JR., in his official capacity as
a justice of the Wisconsin Supreme Court,
PATIENCE D. ROGGENSACK, in her official capacity as
a justice of the Wisconsin Supreme Court,
ANNETTE KINGSLAND ZIEGLER, in her official capacity as
a justice of the Wisconsin Supreme Court,
PAM RADLOFF, in her official capacity as
Deputy Director of Management Services, Wisconsin State Courts,
MARGARET BRADY, in her official capacity as
human resources officer for the Wisconsin State Courts,
DOUG LA FOLLETTE, in his official capacity as
Secretary of State of the State of Wisconsin, and
MATT ADAMCZYK, in his official capacity as
State Treasurer of Wisconsin,

                    Defendants.

The Wisconsin Supreme Court, once a sterling example among state supreme courts,

has hit a long rough patch, and it has become notorious for the fractiousness of its members.

With that history as a backdrop, the state legislature in 2013 started the process of amending

the state constitution to change the method of selecting the chief justice, from seniority to

election by a majority of the sitting justices. Ratification of that amendment was completed on April 7, 2015, when it was approved in a state-wide referendum. The day after the referendum, then-Chief Justice Shirley Abrahamson, with five citizens who had voted for her re-election in 2009, filed this lawsuit.

Plaintiffs do not challenge the amendment itself. They concede, as they must, that Wisconsin has the power to change the manner of selecting its chief justice. Nor do they challenge that the amendment was duly ratified according to the process established in the Wisconsin Constitution. Rather, plaintiffs seek only an interpretation of the amendment, under which the amendment would not be implemented until the next vacancy in the position of chief justice, which is to say when Abrahamson leaves the position. Plaintiffs contend that their interpretation is justified not only because it is a sound interpretation of the amendment under Wisconsin law, but because a contrary interpretation would run afoul of the United States Constitution, which protects plaintiffs' rights to due process and equal protection.

The interpretation of an amendment to the Wisconsin Constitution is a matter for the state courts of Wisconsin. This federal court does not have to guess what that interpretation would be, because on April 29, 2015, the day that the referendum was certified, four justices voted to elect Justice Roggensack as the new chief. But the federal constitutional issues remain for this court to resolve.

Plaintiffs press a theory grounded in well-established principles, but novel in their application to the situation at hand. To paraphrase it simply, plaintiffs contend that if Wisconsin wanted to change the manner of selecting its chief justice immediately, so that it would deprive Abrahamson of the position before her term as chief was over, Wisconsin

needed to do so with an amendment of utter clarity. Otherwise, the voters did not truly understand what they were voting for, and Abrahamson did not have sufficient notice that her position as chief was on the line. The court is not persuaded by plaintiffs' case, for reasons explained in this opinion. But to summarize the court's reasoning in simple terms: Constitutional provisions are drawn with broad strokes. There is no requirement that a state, in restructuring its government or the powers and duties of its officials by means of a constitutional amendment, do so with super-clarity to protect the interests of the officials or voters whose interests might be impaired. Unless its actions are plainly unconstitutional, Wisconsin has the authority and autonomy to restructure its government without interference from the federal government.

The court concludes that Wisconsin's new method of selecting its chief justice was effective on April 29, 2015, when the referendum was certified, and that the Wisconsin Supreme Court was authorized to implement that method and to elect a new chief justice on that day. Defendants are entitled to summary judgment; plaintiffs' case is dismissed.

## MATERIAL FACTS

The parties have stipulated to most of the material facts in this case. Dkt. 86. At the court's invitation, some parties submitted additional information through affidavits and other documents. *See, e.g.*, Dkt. 89; Dkt. 90; Dkt. 104. For the most part, the additional information is not disputed, but it is also not material to the court's determination of the issues. Accordingly, unless otherwise noted, the court draws the following undisputed facts from the parties' joint stipulation.

Plaintiff Shirley Abrahamson has served as a justice of the Wisconsin Supreme Court since 1976. She has been reelected to ten-year terms four times since then, most recently in 2009. Her current term expires in 2019. Plaintiffs Joseph Heim, David Perkins, John Lien, and Marilyn Wittry are Wisconsin residents who voted for Abrahamson in 2009. Plaintiff Hilde Adler served as the treasurer of Abrahamson's reelection committee in 2009. The court will refer to these parties collectively as "plaintiffs," or separately as "Abrahamson" and the "voter plaintiffs."

Defendants Anne Walsh Bradley, N. Patrick Crooks, Michael Gablemen, David Prosser, Patience Roggensack, and Annette Kingsland Ziegler are the other current justices of the Wisconsin Supreme Court, Abrahamson's colleagues. They were in office during the period at issue in this case. The court will refer to these defendants as the "justice defendants."[1] Plaintiffs have sued the justice defendants in their official capacities.

The remaining defendants, also sued in their official capacities, are other Wisconsin government officials. Scott Neitzel is the Secretary of the Wisconsin Department of Administration, Pam Radloff is the Deputy Director of State Courts, Margaret Brady is the Human Resources Officer for the Wisconsin Court System, Douglas La Follette is the Secretary of State, and Matt Adamczyk is the State Treasurer. The Department of Administration, which is also a defendant, is an agency in Wisconsin's executive branch. The court will refer to these defendants as the "state defendants."

---

[1] Bradley filed an undated answer admitting to almost every allegation in the complaint and admitting that plaintiffs are entitled to the relief that they seek. Dkt. 43. For simplicity, the court will nevertheless include her in the "justice defendants" designation when recounting the facts of the case. But the court recognizes that Bradley stands apart from the other justice defendants. She is representing herself, and her support for plaintiffs on the merits is clear, even though she has not filed a substantive brief.

For more than a century, the chief justice of the Wisconsin Supreme Court was selected on the basis of seniority. The state's constitution provided that "[t]he justice having been longest a continuous member of said court . . . shall be the chief justice." Wis. Const. art. VII, § 4(2) (prior to 2015 amendment). The chief justice serves as the administrative head of the state's judicial system and receives additional salary of $8,000.

The seniority selection provision was in effect in 1996, when Abrahamson became the chief justice by virtue of being longest-serving member of the supreme court. Abrahamson continued to serve as chief justice after being reelected to the supreme court in 1999 and 2009. In the 2009 election, Abrahamson overtly campaigned as "chief justice," but she really was not standing for election as chief justice: the office to which Abrahamson was elected was "justice of the supreme court." The practical result of her reelection, however, was that she would continue to serve as chief justice by virtue of the seniority selection method in effect at the time.

In 2015, Wisconsin amended its constitution to change the way in which the chief justice is selected. The amendment was several years in the making. The state legislature approved the amendment in two consecutive sessions, and the measure was then posed as a referendum question in a state-wide election on April 7, 2015. As it appeared on the ballot, the referendum read:

> Election of chief justice. Shall Section 4 (2) of Article VII of the constitution be amended to direct that a chief justice of the supreme court shall be elected for a two-year term by a majority of the justices then serving on the court?

The state's Government Accountability Board (GAB) provided the following explanation of the referendum to the voters:

> The Wisconsin constitution currently provides that the chief justice of the Wisconsin Supreme Court is its longest-serving member. The proposed constitutional amendment would instead select the chief justice through an election by a majority of the justices then serving on the Court.
>
> A "yes" vote on this question would mean that the chief justice shall be elected for a term of two years by a majority of the justices then serving on the Wisconsin Supreme Court. The justice who is elected may decline to serve as chief justice or resign the position, but still continue to serve as a justice of the Wisconsin Supreme Court.
>
> A "no" vote would mean that the longest-serving member of the Wisconsin Supreme Court serves as chief justice of the Court. The justice designated as chief justice may decline to serve as chief justice or resign the position, but still continue to serve as a justice of the Wisconsin Supreme Court.

The referendum passed with almost 53% of the vote.

The day after the election, plaintiffs filed this action under 42 U.S.C. § 1983, a federal statute authorizing suits in federal court to vindicate claims of constitutional violations. Their complaint alleges that the amendment, if implemented immediately to oust Abrahamson as chief justice before her current term expires, would violate plaintiffs' federal constitutional rights to due process and to equal protection. They seek declaratory relief and an injunction preventing defendants from implementing the amendment before the end of Abrahamson's current term, or until a vacancy otherwise occurs in the office of chief justice. Plaintiffs moved for a temporary restraining order and for preliminary injunction. The court denied plaintiffs' motion for a temporary restraining order, and denied the request again when plaintiffs' counsel orally renewed the motion at a hearing on April 21, 2015. Following the hearing, the court ordered briefing on plaintiffs' motion for preliminary injunction.

The GAB certified the election results during a regularly scheduled meeting on April 29, 2015. The day before, in anticipation of the certification, Gableman moved to elect Roggensack as the new chief justice, and to allow the court's members to vote by email. Three justices, including Abrahamson, objected to the motions, contending that a vote would be premature given plaintiffs' suit in this court. Notwithstanding the objections, the other four justices cast their votes in favor of electing Roggensack. The three objecting justices did not vote. Gableman certified the results of the court's internal election on May 1, 2015.

Two weeks later, this court held a hearing on plaintiffs' motion for preliminary injunction. The court denied plaintiffs' motion and set a briefing schedule on the merits of plaintiffs' claims. Dkt. 77. Plaintiffs appealed the denial of their motion for preliminary injunction to the Seventh Circuit, Dkt. 81, and that appeal is currently being briefed. This court refused to stay its consideration of the merits of this case while the appeal of the preliminary injunction is pending. Dkt. 95.

This brings us to how things presently stand. Abrahamson contends that she is still the chief justice of the Wisconsin Supreme Court, and that neither the amendment nor her colleagues' election of a new chief justice deprived her of the position. Defendants (with the exception of Bradley) disagree, contending that Roggensack is now the chief justice. The justice defendants and the state defendants have moved to dismiss plaintiffs' complaint. The parties and the court agreed to convert these motions to motions for summary judgment, and to resolve this case before the supreme court's 2015-16 term begins in August.

ANALYSIS

Plaintiffs do not dispute that Wisconsin has the power to change the manner of selecting its chief justice. Nor do plaintiffs dispute that Wisconsin could change the powers and duties of a state official, even in the middle of the official's term, if it did so clearly. Wisconsin has done so before, in 1977, when it shortened the terms of the sitting justices as part of the restructuring of the Wisconsin court system. Wis. Const. art. XIV, § 16, *created by* Wisconsin Unified Court System Amendment, 1975 J.R. 13, 1977 J.R. 7, vote April 1977. And plaintiffs do not challenge the enactment of the 2015 amendment to the Wisconsin constitution at issue in this case. Plaintiffs' case is more subtle.

Plaintiffs contend that the 2015 amendment did not, in fact, affect Abrahamson's entitlement to serve as chief justice, because it applies only after she completes her current term as chief justice. There are two facets to this argument. First, plaintiffs argue that because the amendment does not provide an implementation date, as a matter of sound constitutional interpretation under Wisconsin law, the amendment should be interpreted so that it would not apply to Abrahamson. Second, plaintiffs argue that if the amendment were interpreted to apply immediately to remove Abrahamson as chief justice, it would violate plaintiffs' rights under the U.S. Constitution because the ambiguously worded amendment did not provide adequate notice to Abrahamson or to voters. Thus, in plaintiffs' case, federal constitutional questions are intertwined with the state-law question of how to interpret the amendment.

But, at this point in the case, the state-law question has receded to the background. When this case was filed, the day after the election that ratified the amendment, it was arguably an open question whether Wisconsin would interpret the amendment to require

immediate implementation. But the justice defendants answered that question as soon as the election was certified, by electing Roggensack as chief justice by an email vote. The court has some misgivings about whether this election actually reflects a judicial interpretation of the amendment, because the issue was not presented to the court in the usual manner with advocates presenting the competing positions. Nor was it resolved in the usual manner, which typically involves at least some measure of deliberation in which all the justices participate. But the down-and-dirty interpretation (which defendants dignify with the term "de facto") will do for the purposes of this case.[2] After all, "the state is the final arbiter of what is state law." *W. v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). It would make little sense for this court to interpret the amendment, when it is already clear how Wisconsin will do so. Nor will this court have to decide whether the email vote for Roggensack was proper, because the court is aware of no rule requiring any different process, and the propriety of that vote would also be a question of state law. This opinion thus addresses only the federal issues.

The merits of plaintiffs' constitutional claims are now before the court on defendants' motion to dismiss, Dkt. 45 and Dkt. 49, which the court has converted to motions for summary judgment to allow the parties to submit materials outside the pleadings, and thereby to complete the factual record. Thus, the familiar summary judgment standard applies. To prevail on their motions, defendants as moving parties, must "show[] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of

---

[2] The state defendants suggest that the court should abstain from reaching the merits if the state-law interpretation of the amendment is in doubt. Dkt. 46, at 8. Abstention for this reason, which would be under the *Pullman* doctrine, is not appropriate because the state has plainly implemented the amendment to apply immediately, and there is no pending state proceeding that might yield a different interpretation. *See Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011).

law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## A. Threshold issues

This is an unusual case: a sitting justice of a state supreme court has sued officials and agencies of that state in federal court. Because plaintiffs sue the individual defendants in their official capacities, this suit is effectively one against the state itself. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The circumstances under which anyone can sue a state in federal court are limited by principles of federalism, and thus it is not surprising that defendants identify several threshold issues that would limit the scope of the suit, or even preclude this court from reaching the merits of plaintiffs' claims.

### 1. Proper defendants

The state defendants first ask the court to trim improper defendants from this case—specifically, the Department of Administration (DOA), the Secretary of State, and the State Treasurer. Because defendants are entitled to summary judgment on the merits of plaintiffs' claims, dismissing particular defendants is a somewhat academic exercise. Nevertheless, the state defendants are correct that two of the named defendants do not belong in this suit: the DOA and the Treasurer. The Secretary of State, however, is a proper defendant.

The DOA is a state agency, which is not a suable "person" under § 1983. *Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012). Plaintiffs do not dispute the point, *see* Dkt. 96, at 14-17, nor is there any conceivable basis on which to do so. The DOA is not a proper party to this suit, and it will therefore be dismissed.

With regard to the Treasurer, the parties agree that he has a statutory duty "to sign checks for the state, which occurs when authorized individuals affix a copy of his signature on state checks." Dkt. 86, ¶ 8. But in an affidavit, the Treasurer explains that he is not responsible for signing the checks issued to the justices of the Wisconsin Supreme Court. Dkt. 108, ¶ 4. He also states that he does not have the responsibility to order the individuals who *are* authorized to sign the justices' checks to sign or not sign them. *Id.* ¶ 5. For this reason, the state defendants contend that the Treasurer is not a proper party because he could not provide any relief that the court would order if plaintiffs are successful. Plaintiffs do not dispute that the Treasurer's affidavit accurately describes his authority. Rather, they protest that the state defendants have not identified the person who *does* have the power to sign the justices' checks (or who has supervisory authority over such a person). Dkt. 119, at 15. According to the state defendants, however, "[t]he complaint has named two other defendants that are the proper defendants for concerns about Abrahamson's paycheck, specifically Pam Radloff . . . and Margaret Brady." Dkt. 46, at 32. Plaintiffs do not explain why they must sue the Treasurer as well as these defendants, and it is not clear why it should fall to anyone other than plaintiffs to identify the correct defendants; this is *their* lawsuit.[3] The Treasurer is not a proper party to this suit because he cannot provide the relief plaintiffs seek, and he will be dismissed for that reason.

Finally, the Secretary of State is a proper party because plaintiffs have identified possible injunctive relief that the court could provide that would involve his official duties. The Secretary of State is responsible for keeping a repository for the oaths of office for public

---

[3] The Seventh Circuit has required district courts to assist *pro se* plaintiffs in identifying proper defendants. *See Donald v. Cook Cnty. Sheriff's Dep't*, 95 F.3d 548, 555 n.3 (7th Cir. 1996) (collecting cases). But plaintiffs are not proceeding *pro se* in this case.

officials in Wisconsin. Wis. Stat. §§ 14.38 and 19.01. He maintains, for example, the oaths that Abrahamson took when she was elected to the supreme court and each time that she won reelection. The Secretary of State also maintains the oath that Abrahamson took in 1999, when she was designated as the chief justice by virtue of her seniority. *See* Dkt. 86-4. The state defendants assure the court that Roggensack has not taken a new oath, Dkt. 109, at 16 n.8, but should she choose to do so in the future, plaintiffs apparently want to enjoin the Secretary of State from filing the document.[4] The Secretary of State arguably has "final policymaking authority" with regard to accepting and filing oaths of office, such that an injunction against him would be proper if plaintiffs were to succeed on the merits. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). The state defendants have therefore failed to articulate a sufficient reason to dismiss the Secretary of State.

### 2. The voter plaintiffs' standing

The voter plaintiffs bring two claims against defendants. They allege that the amendment violates their federal rights to due process and equal protection "by diluting and debasing the value and meaning of the votes [that] they cast on April 7, 2009[,] for Chief Justice Abrahamson, by reducing the term of office that that election led them to believe would be filled by . . . Abrahamson until July 31, 2019." Dkt. 1, ¶¶ 52, 54. Up to this point, the court has assumed, without deciding, that the voter plaintiffs have standing to pursue these claims. *See, e.g.*, Dkt. 77, at 2 n.1. But defendants' motions place the issue of standing front-and-center and it is ripe for resolution.

---

[4] The parties appear to agree that a justice can, but is not required to, take a new oath of office upon assuming the position of chief justice.

The question of standing concerns whether a litigant is entitled to have the court decide the merits of her claim for relief. Standing has two distinct, but related, strands: Article III standing, or constitutional standing; and prudential standing, sometimes referred to as non-constitutional standing. *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007). As the name suggests, Article III standing concerns the constitutional limit on federal court jurisdiction under the Constitution, which limits federal courts to deciding actual "'Cases' and 'Controversies'" between directly involved parties, rather than abstract questions of law. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). Prudential standing, on the other hand, is essentially a form of judicial self-governance in which federal courts refrain from deciding disputes that would be better resolved by other governmental institutions. *FMC Corp. v. Boesky*, 852 F.2d 981, 987 (7th Cir. 1988). Cases in which the litigants challenge the constitutionality of a legislative act commonly raise Article III standing issues, and in this case defendants challenge that the voter plaintiffs lack constitutional standing under Article III.[5]

To establish Article III standing the voter plaintiffs must demonstrate that they have suffered: "(1) a concrete and particularized 'injury in fact' (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable judicial decision." *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 819 (7th Cir. 2014)

---

[5] The justice defendants also contend that Abrahamson lacks Article III standing because she has not pled an injury that is fairly traceable to the defendant justices' conduct. Dkt. 50, at 10-12. They argue that Abrahamson lost her position as chief justice by virtue of the legislative process and not by any action by the defendants. But this argument misstates Abrahamson's case: she challenges defendants' interpretation of the amendment, pursuant to which they have immediately implemented to remove her from the position of chief justice. Her harm is directly traceable to the defendants, and Abrahamson has standing to pursue her claims.

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Here, the injury in fact that the voter plaintiffs allege is vote dilution. According to the voter plaintiffs, implementing the amendment immediately prevents them from receiving the "full and intended effect [of] their votes." Dkt. 96, at 12. They contend that when they voted for Abrahamson in 2009, they expected that she would serve as chief justice for ten years (absent recall or resignation), by virtue of the seniority-based method in the Wisconsin Constitution at the time. Defendants assert that these allegations fall short of identifying an injury in fact.

The injury that the voter plaintiffs allege is not accurately described as "vote dilution." The Constitution protects "the right of all qualified citizens to vote in state and federal elections . . . and [] the right to have votes counted without dilution as compared to the votes of others." *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986) (internal citations omitted). Indeed, the cases that the voter plaintiffs cite to support their claim to standing all concern governmental interference with the right to vote and to have that vote properly counted for purposes of determining the election's outcome. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (citizens had standing to challenge the use statistical sampling in the national census); *Judge v. Quinn*, 612 F.3d 537 (7th Cir.), *opinion amended on denial of reh'g*, 387 F. App'x 629 (7th Cir. 2010) (Illinois voters had standing to assert a claim against their governor for refusing to allow the state's citizens to vote for U.S. Senator, as guaranteed by the Seventeenth Amendment); *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994) (congressmen and private voters had standing to challenge the constitutionality of allowing territorial delegates to vote in a congressional committee). The voter plaintiffs do not contend that they were not permitted to vote, or that their votes were

not properly counted in the 2009 election. Actual vote dilution claims are readily distinguishable from the claims plaintiffs make here.

The voter plaintiffs' most analogous case is probably *Powell v. McCormack*, 395 U.S. 486 (1969). In *Powell*, Adam Clayton Powell, Jr. was duly elected by to serve as a U.S. representative from New York in Congress. But a committee of the House of Representatives had raised ethical charges against Powell, and the members of the House, by special resolution, refused to seat him. Powell and voters who supported him challenged the refusal to seat him. The Court did not specifically address the issue of whether the voters had suffered an injury sufficient to achieve Article III standing, but it concluded that the case was generally justiciable. *Id.* at 549-50. By negative implication at least, the voters in *Powell* had injuries sufficient to have their claims decided. But *Powell* is distinguishable because Wisconsin has never withheld from Abrahamson the office to which the voter plaintiffs elected her: Justice of the Wisconsin Supreme Court. And Abrahamson assumed the position of chief justice pursuant to the seniority rules in place at the time. Only later, after certification of the amendment, was Abrahamson removed from the position of chief justice. So, ultimately, *Powell* is not close enough to provide much guidance on the Article III standing question here.

Stripped of the vote-dilution rhetoric, the voter plaintiffs' claim is really just a disagreement with the way Wisconsin has interpreted the amendment providing a new method of selecting its chief justice. But disagreement with a state law or policy does not constitute an injury in fact sufficient to achieve Article III standing. A more analogous case is *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013). In *Hollingsworth*, same-sex couples filed a federal lawsuit challenging California's Proposition 8, a successful ballot initiative that

amended the California constitution to ban same-sex marriage. But the state officials named as defendants refused to defend the law. The district court allowed certain citizens, the official proponents of Proposition 8, to intervene to defend it and, after a trial, held the law unconstitutional. The Ninth Circuit held that the official proponents had Article III standing, and affirmed the district court on the merits. But the Supreme Court reversed, holding that the official proponents of Proposition 8 had not suffered an injury in fact and did not have Article III standing. "We have repeatedly held that such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing. A litigant raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Id.* at 2662 (citations and quotation marks omitted).

The voter plaintiffs here have suffered, at most, the same injury as the official proponents of Proposition 8. And like the official proponents of Proposition 8, the voter plaintiffs here lack standing to sue in federal court to press for their preferred interpretation of the 2015 amendment to the Wisconsin constitution, despite their sincere commitment to their cause. The voter plaintiffs must be dismissed for lack of standing.

### 3. Sovereign immunity

The final threshold issue is sovereign immunity. The Eleventh Amendment generally prevents individuals from suing states in federal court, unless the state has consented to such a suit (which Wisconsin does for some suits, through its notice of claim procedure). Wisconsin has not consented to this suit.

But *Ex parte Young*, 209 U.S. 123 (1908), created an exception to this form of sovereign immunity for suits against state officials that seek prospective injunctive relief. Reviewing this doctrine, the Supreme Court has explained:

> if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity. . . . Where a plaintiff seeks prospective relief to end a state officer's ongoing violation of federal law, such a claim can ordinarily proceed in federal court. . . . The doctrine is not, however, without limitations. A federal court cannot award retrospective relief, designed to remedy past violations of federal law.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) (internal citations omitted). Here, the justice defendants contend that the *Ex parte Young* doctrine does not apply because plaintiffs seek only *retrospective* relief, for which there is no exception to the Eleventh Amendment. The justice defendants therefore assert that sovereign immunity bars plaintiffs' claims. The court disagrees.

The court starts with a common-sense view of plaintiffs' claims, which is that their constitutional rights have been violated by the immediate implementation of the amendment, and that this violation is ongoing and will continue until 2019, when Abrahamson's entitlement to the position of chief justice will legitimately terminate. Because plaintiffs ask this court to terminate an on-going violation of their rights, *Ex parte Young* applies.

Defendants' argument is based on their interpretation of the amendment, according to which the position of chief justice was vacated on April 29, 2015, by operation of law immediately upon certification of the amendment. Pursuant to Wis. Stat. § 7.70(3)(h), a

17

constitutional amendment that does not state an effective date becomes effective upon certification. Defendants argue that when the amendment became effective, Abrahamson lost her constitutional authority to hold the position of chief justice, because the seniority provision that had once made her chief justice was no longer effective. The position was thus vacant; there was no chief justice as of that moment.[6] So, the justice defendants argue, there is no forward-looking relief that defendants can possibly provide. Even if they rescinded Roggensack's election, it would simply put everyone back at the point at which the office of chief justice was vacant.

The justice defendants analogize Abrahamson's situation to *Opala v. Watt*, 454 F.3d 1154 (10th Cir. 2006). In *Opala*, the Tenth Circuit applied *Ex parte Young* to a dispute between a justice of the Oklahoma Supreme Court and his colleagues. *Id.* The Oklahoma court elected its chief justice under a rotation system by which each justice would have a turn to serve as chief justice. *Id.* at 1155. There was no set order for the rotation, but the plaintiff, Justice Opala, alleged that by virtue of his status as vice-chief justice, he would likely be next in line because the court's internal rules prevented a justice from serving as chief for two consecutive terms. *Id.* at 1156. The Oklahoma court then changed its internal rules, which allowed the current chief justice to serve a second consecutive term, and under the new rules the current chief was re-elected. *Id.* Justice Opala sued to declare the new rule unconstitutional. But the Tenth Circuit held that the complaint sought only retrospective

---

[6] The court is not persuaded that the position of chief justice was vacant upon certification of the amendment. The amendment is not self-effectuating; the sitting justices of the court must elect the new chief. *See Kayden Indus., Inc. v. Murphy*, 34 Wis. 2d 718, 150 N.W.2d 447, 453 (1967). Nothing in the amendment suggests that the framers of the amendment intended that the position of chief would sit vacant while the court selected a new chief.

18

relief, because an order declaring the new rule unconstitutional would not make Opala chief; he would still have to stand for election under the old rule. *Id.* at 1160.

Despite the similarities, *Opala* is distinguishable in a critical respect. Opala was never chief, and his complaint alleged only that he would have to stand for election to the position of chief justice under the less-favorable new rule, as opposed to under the old rule. As the *Opala* court reasoned, granting the relief he requested—putting the old rule back in place— would not redress his injury. Here, however, Abrahamson *was* the chief justice of the Wisconsin Supreme Court. And if she were to secure the relief she seeks—her interpretation of the amendment—she could remain chief justice until the end of her term as justice in 2019.[7]

The plaintiffs in this case ask the court to enjoin defendants from "taking any other action inconsistent with [Abrahamson's] continuance in office as chief justice for the remainder of her term due to end July 31, 2019." Dkt. 1, at 16. This is prospective relief. "A court applying the *Ex parte Young* doctrine now need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (citations and quotation marks omitted). There may be a retrospective component to plaintiff's requested relief in that the court would implicitly invalidate defendants' actions following the GAB's certification of the amendment. But the relief that plaintiffs seek is fundamentally forward-looking. If plaintiffs succeed on the merits, then the court would prevent defendants from treating Abrahamson as anything

---

[7] Opala might be on point if Bradley were challenging the amendment: as the next most-senior justice, she would have been in line to succeed Abrahamson as chief justice.

but chief justice until the end of her term. Because the *Ex parte Young* doctrine applies, sovereign immunity does not bar this suit.

## B.  Abrahamson's procedural due process claim

Abrahamson alleges that implementing the amendment immediately violates her right to procedural due process. To succeed on a procedural due process claim, Abrahamson must show that she: (1) has a cognizable property interest in the position of chief justice; (2) has suffered a deprivation of that interest; and (3) was denied due process. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010). The parties do not dispute that defendants' interpretation and immediate implementation of the amendment deprived Abrahamson of the position of chief justice. But they disagree about whether Abrahamson has a protected interest in the position and, if so, whether the amendment provided process appropriate to her interest.

### 1.  Protected interest

The first question in Abrahamson's due process claim is whether she has an interest in the position of chief justice that is protected by the Federal Constitution. The court must look to Wisconsin law to determine whether Abrahamson has such an interest. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). In this case, the source of Abrahamson's potential entitlement to the position of chief justice is the Wisconsin Constitution, as it existed before the amendment, which defined the position that Abrahamson held.

To be clear, there is no dispute that Abrahamson had some kind of interest in the position of chief justice. The question is whether Abrahamson's state-created interest in the position of chief justice is an interest protected under the Federal Constitution.

Defendants contend that the answer is a simple "no," based on the holdings of two older U.S. Supreme Court cases, *Taylor v. Beckham*, 178 U.S. 548 (1900), and *Snowden v. Hughes*, 321 U.S. 1 (1944). *Snowden* puts it pretty bluntly: "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause." 321 U.S. at 7. *Snowden's* statement is jarring to contemporary sensibilities, because it means that if a state official is illegally removed from office, that is a matter solely of state law that does not concern the Federal Constitution in the least. Modern courts have questioned this principle because the Supreme Court has greatly expanded the range of constitutionally protected interests since *Snowden*, although neither *Taylor* nor *Snowden* has been overruled, which only the Supreme Court itself can do. *See Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005).

Abrahamson contends that the *Taylor/Snowden* due process jurisprudence has been superseded by the Supreme Court's due process decisions in the second half of the twentieth century. The evolution from *Taylor* to *Roth* is traced by the Seventh Circuit in *Patterson v. Portch*, which succinctly paraphrases the contemporary view of property under the Fourteenth Amendment as "any interest to which a government has given someone an entitlement." 853 F.2d 1399, 1405 (7th Cir. 1988). As *Patterson* points out, however, the apparent simplicity of this formulation merely shifts the more complex inquiry to the question of what process is due before the deprivation of that interest. The Seventh Circuit has, in at least one case,

21

applied the *Roth* analysis to the due process claims of a government official without mentioning *Taylor* or *Snowden*. *Wolf v. City of Fitchburg*, 870 F.2d 1327 (7th Cir. 1989).

Abrahamson also attempts to distinguish *Taylor* and *Snowden* on their facts. She argues that neither case established an absolute rule that a state office can *never* be property under the due process clause. She contends that the Court in *Taylor* had concluded only that the offices at issue did not constitute "property" under the law of the state, and therefore those offices could not constitute a protectable property interest under the federal due process clause either. Dkt. 96, at 21. *Snowden* merely incorporates the result from *Taylor*, and thus its holding can go no further than *Taylor's*. Abrahamson's argument is at least plausible: the *Taylor* opinion contains a number of statements suggesting that there might be some due process limits on a state's authority to depose a state official, and it includes the moderating statement that "*generally speaking*, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right. 178 U.S. at 577 (emphasis added).

If the court were to follow *Taylor* and *Snowden*, and there are compelling reasons to do so, the analysis of Abrahamson's due process claim could end right here. This court would be constrained to follow on-point Supreme Court precedent, even if other courts have made a good case that the precedent is obsolete. Actually, *Taylor's* reasoning carries considerable force, even after *Roth*. When a state acts as an employer, or as a distributor of education or welfare benefits, the Fourteenth Amendment properly requires that the state not deprive its employees or its beneficiaries of property to which they might be entitled without appropriate notice and an opportunity to be heard. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976). But when a state chooses to restructure its government—including the manner of selecting its officials and assigning their powers and duties—it may do so without

interference from the federal government. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Taylor*). If state officials, whose duties and benefits might be changed, could object on due process grounds to structural changes in state government, the federal courts would inevitably be drawn into disputes over matters that are properly for the state alone, because virtually any change in the structure of state government has the potential to adversely affect some of its officials.

Nevertheless, if for no other reason than to provide a complete due process analysis in this opinion, the court will press on to consider Abrahamson's due process claim as though it must be decided under *Roth* and its progeny. Under *Roth*, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. It was not merely Abrahamson's unilateral expectation that she would still be chief justice after her re-election in 2009. Once re-elected, she could choose to decline to serve as chief justice, but she was entitled to hold that position by virtue of her seniority as long as she served as a justice on the court. And the circumstances under which she could be removed as a justice were sharply circumscribed by the Wisconsin Constitution. Indeed, her entitlement to the position of chief justice was precisely co-extensive with her entitlement to serve as a justice on the court. As chief justice, she held a position that was at least as secure as a tenured professor at a state university, a position that gave rise to a protected property interest in *Patterson*. 853 F.2d at 1405. The fact that Abrahamson's position, or that of a tenured professor, might be stripped by a change in state law does not mean that the position is not a property interest protected under the Fourteenth Amendment. *Youakim v. McDonald*, 71 F.3d 1274, 1289 (7th Cir. 1995).

Defendants go to great lengths to show that there is no "office" of chief justice under the Wisconsin Constitution. They are correct: the Wisconsin Constitution establishes an elected office of justice of the supreme court. There are no longer state-wide elections for chief justice.[8] The Wisconsin Supreme Court now comprises seven justices, *not* six justices and a chief justice. *See* Wis. Const. art. VII, § 4 ("The supreme court shall have 7 members who shall be known as justices of the supreme court."). But this distinction, between an "office" and the position of chief justice (which defendants refer to as a "designation"), does not make defendants' case. By implicitly demeaning the position of chief justice as a mere "designation," defendants suggest that it is a role of such minimal importance that it cannot constitute property. *Cf. Swick v. City of Chi.*, 11 F.3d 85, 87 (7th Cir. 1993) (police officer's involuntary sick leave, with pay, deprived him of the "right to wear a uniform and a badge, to carry a gun, to arrest people, and to carry out other functions of a police officer or other public officer," but these were *de minimis* property interests). But the court has found no analogous authority that supports the idea that the powers and duties of the position of chief justice under the Wisconsin Constitution are so trifling as to be deemed *de minimis* and not sufficient to constitute property under the Fourteenth Amendment.

The chief justice is a position of constitutional dignity in Wisconsin. There is no one with unfettered discretion to remove a justice from the position of chief. *C.f., Brown v. City of Mich. City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006). The entitlement to serve as chief justice is defined in the state constitution, which also articulates the powers attendant on the

---

[8] The Wisconsin Constitution used to create a separate office of chief justice, with a separate state-wide election for that office. *History of the courts*, Wisconsin Court System, https://www.wicourts.gov/courts/history/index.htm (last updated March 7, 2012). Wisconsin did away with the distinction in 1889. *Id.*

position. The chief justice also draws a higher salary than the other justices. These characteristics carry the position of chief justice well above the *de minimis* threshold required for a benefit to rise to the level of a cognizable interest. The position of chief justice confers secure, state-created powers and benefits to the one who holds that position. Under *Roth*, the position of chief justice entails a property interest to which due process protections apply.

### 2.   The process to which Abrahamson was due

The heart of Abrahamson's argument is that the amendment does not clearly express the intent that it be applied retroactively.[9] And, she argues, without a such a clearly expressed intent, it must be applied only prospectively, or it would violate her right to due process.

The Supreme Court describes retroactivity in general as any law that "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). But retroactivity is not an all-or-nothing proposition, and not every retroactive effect is unconstitutional or even disfavored. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law." *Id.* at 269 (internal citations omitted).

Abrahamson's theory of retroactivity is that when she was re-elected as justice in 2009, she and the voters who supported her had a settled expectation that she would be entitled to serve as chief justice until her term as justice expired in 2019. Defendants point

---

[9] Abrahamson also makes the argument, based on another well-established canon of construction, that her interpretation of the amendment is preferred because it avoids a serious constitutional question. This argument would be properly addressed to a Wisconsin court faced with the task of interpreting the amendment. But it is misplaced here where the very issue before the court is whether Wisconsin's interpretation poses the constitutional problems that Abrahamson says it does.

out that she was not, however, specifically elected as chief justice, which is quite true. But still, after her re-election in 2009, she had the very realistic expectation—based on the law in effect at the time—that she would be chief, if she wanted and she were still serving as justice, until 2019. Abrahamson's expectations have certainly been upset by the defendants' immediate implementation of the amendment. In that same way, the legal effect of the 2009 election has also been changed by the defendants' implementation of the amendment. Thus, the immediate implementation of the amendment has some retroactive effect. But that is not enough to make Abrahamson's case.

Under *Landgraf*, the retroactivity analysis is a two-step process. The first step is to determine whether there is clear expression of legislative intent for retroactive application. *Jeudy v. Holder*, 768 F.3d 595, 600 (7th Cir. 2014). The second question is whether the particular retroactive effect at issue is impermissible. *Id*. It is not impermissible merely because its retroactive effect is not clearly expressed. "In other words, silence or ambiguity in the statutory text and history requires the court to move on to step two, not to declare a victory for the opponent of retroactivity." *Id*. (citations and quotation marks omitted). Abrahamson makes a fair showing at step one, but she comes up empty at step two.

The court begins at *Landgraf* step one. The parties present diametrically opposed views on the question of whether the amendment is ambiguous. The justice defendants contend that the plain language of the amendment is clear, and that it shows that amendment should be implemented immediately. The court is not persuaded by the justice defendants' plain language argument. The amendment itself does not say when it would be effective, or when it should be implemented. But the justice defendants have a better argument based on Wisconsin law concerning constitutional amendments generally.

26

The effective date of the amendment is established by Wis. Stat. § 7.70(3)(h), which provides in pertinent part:

> Whenever a constitutional amendment or other statewide validating or ratifying referendum question which is approved by the people does not expressly state the date of effectiveness, it shall become effective at the time the chairperson of the board or the chairperson's designee certifies that the amendment or referendum question is approved.

The Wisconsin Supreme Court has interpreted the state constitution to be in accord with the statute. *State v. Gonzales*, 2002 WI 59, ¶ 25, 253 Wis. 2d 134, 645 N.W.2d 264, 269. The fact that the immediate effective date is conclusively established under state law counts strongly against the notion that Abrahamson or the voters had no idea that the amendment would be applied immediately to elect a new chief justice.

The parties expend significant effort discussing the legislative history of the amendment. As a general proposition, under Wisconsin law, the "constitutional debates and practices of the time" are an appropriate source for the meaning of a constitutional amendment. *Dairyland Greyhound Park, Inc. v. Doyle*, 2006 WI 107, ¶ 19, 295 Wis. 2d 1, 719 N.W.2d 408, 422. But in this case, the court puts little stock in the legislative history because that history is itself indeterminate. It is clear that the legislature was motivated by some sense of dissatisfaction with the state of the court, and that its purpose was to change the manner of selecting the chief justice. But it is not so clear that the legislature and the voters enacted the amendment to remove Abrahamson from the position of chief justice.

The justice defendants rely heavily on the rejection of two substitute amendments, which had proposed language that would have expressly provided that the amendment would not be applied to Abrahamson. Dkt. 110, at 29-34. The justice defendants contend that the

rejection of these substitute amendments demonstrates unequivocally that the framers of the amendment intended the opposite, that the amendment would apply immediately to Abrahamson. But the counterargument is equally compelling: faced squarely with the issue, the proponents of the amendment declined to make their intent explicit. The amendment did not include an indication that it would apply to Abrahamson, nor did the GAB's explanation of the amendment. So the intent of the voters who ratified the amendment cannot be so readily discerned. The wording of the amendment was, undoubtedly, a political calculation. And it was the wording of the amendment, and not the semi-articulated intent of the legislators who supported or opposed it, that achieved the required endorsement of the legislature and the voters. Accordingly, the court gives little weight to the parties' legislative history evidence and arguments.

The court concludes that Abrahamson has made a plausible showing that the amendment does not clearly express an intended retroactive application. Accordingly, the court moves to step two of the *Landgraf* analysis, to consider whether the retroactive effect at issue here is impermissible.

Abrahamson does not have much to show at step two. The case that Abrahamson cites, *Vartelas v. Holder*, 132 S. Ct. 1479 (2012), involved a past act by a non-citizen that was retroactively assigned a new and serious immigration consequence. This is close to a prototypical prohibited retroactive law, in which a criminal sanction is imposed on an act that was legal when the act was done. Abrahamson's argument is that she expected to be chief until 2019, and she invested in the effort to run for re-election on the basis of that expectation, which has now been upset. This consequence is simply not on par with the retroactive consequences in *Vartelas*, particularly when Abrahamson's interests must be set

against the compelling interest of the State of Wisconsin in structuring its own government. As the Supreme Court has explained, "our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976). The court concludes that the immediate implementation of the amendment is not impermissibly retroactive under *Landgraf*.

But that still leaves the overarching question: whether Abrahamson received the process that she was due. The process to which a person is due before she can be deprived of her protected interest depends on the nature of the interest at stake. *Goss v. Lopez*, 419 U.S. 565, 578 (1975) ("[T]he interpretation and application of the Due Process Clause are intensely practical matters and . . . the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.") (internal citations and quotation marks omitted). And Abrahamson's interest in the position of chief justice is a special one, created under the Wisconsin Constitution by the state's legislature and its citizenry. Her due process claim inevitably runs headlong into "the general rule that the legislature, having created a statutory entitlement, is not precluded from altering or even eliminating the entitlement by later legislation." *Dibble v. Quinn*, No. 14-2746, 2015 WL 4393536, at *5 (7th Cir. July 20, 2015); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (in the context of legislative changes to state-created property interests, "the legislative determination provides all the process that is due"). Here, it is undisputed that the amendment passed in two consecutive sessions in the Wisconsin legislature, and that it was approved by popular vote in a state-wide election. Dkt. 86, ¶¶ 25, 36. A constitutional amendment is the most democratic form of lawmaking that a state can practically undertake—considerable process for altering one person's interests. *See Brown v. Perkins*, 706

29

F. Supp. 633, 634 (N.D. Ill. 1989) ("A general election, with prior registration and public participation, certainly provides pre-termination notice and an opportunity to be heard, and that is precisely what federal due process requires.").

What Abrahamson seeks in this case is, in essence, a new canon of constitutional interpretation, according to which ambiguity in a state constitution must be construed against the state and in favor of any state official whose interests might be diminished under a contrary interpretation. Such a principle would be unprecedented, and it would run counter to a legion of authority that a state is entitled to structure its own government as it sees fit, without interference from the federal courts. The court concludes that even if Abrahamson has a constitutionally protected interest in the position of chief justice, the amendment process, including the state's interpretation and implementation of that amendment, provided her with all the process that was due.

## C. Abrahamson's substantive due process and equal protection claims

Abrahamson's remaining claims allege violations of her right to substantive due process and to equal protection. To support these claims, Abrahamson reprises many of her procedural challenges to the amendment, and she contends that immediately removing her from the position of chief justice "constitutes an arbitrary and irrational act." Dkt. 96, at 30. The court disagrees.

Substantive due process claims and equal protection claims involve similar legal inquires. Beginning with due process, the Supreme Court and the Seventh Circuit "have emphasized how limited the scope of the substantive due process doctrine is. . . . [It] is not a blanket protection against unjustifiable interferences with property." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003) (internal citations and quotation marks omitted); *see also*

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Lee*, 330 F.3d at 467. For Abrahamson's class-of-one equal protection claim, she must show that she was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013) (citations and quotation marks omitted), *cert. denied*, 134 S. Ct. 1308 (2014).

Both claims turn on whether it was rational for Wisconsin to change the selection method for its chief justice and to implement the new method immediately. The Seventh Circuit has held that the "rational-basis variant of substantive due process differs little, if at all, from the most deferential form of equal protection review." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014) (citations omitted). "When we review the constitutionality of state legislation, we must ask whether the act in question impacts a fundamental right or targets a suspect class. When no suspect class or fundamental right is involved, we employ a rational basis test to determine whether the legislative act is constitutional." *Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002), *as amended on denial of reh'g* (Aug. 12, 2002). With these similarities in mind, the court will address Abrahamson's substantive due process and equal protection claims together.

"The rational-basis requirement sets the legal bar low and simply requires a rational relationship between the disparity of treatment and some legitimate governmental purpose." *D.B. ex rel. Kurtis B.*, 725 F.3d at 686 (citations and quotation marks omitted). "[A] given action can have a rational basis and be a perfectly logical action for a government entity to

take even if there are facts casting it as one taken out of animosity." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008). Defendants contend that moving from a seniority-based system for selecting a chief justice to an internal election by the justices is an abundantly rational decision. According to defendants, the Wisconsin legislature determined that a chief justice who earned the designation from her colleagues would be a more effective leader than one who had simply been on the supreme court the longest. And of course, the new method does not prevent the senior-most justice from serving as chief justice; it simply gives the members of the supreme court the choice to select their own leader. A plurality of states across the country use a peer-vote system to select a chief justice, and Abrahamson cannot genuinely dispute that it was rational for Wisconsin to choose to join that plurality to provide more effective leadership for the court. This might not have been a good reason, or a fair one. But it is undeniably rational.

To salvage her substantive due process and equal protection claims, Abrahamson retreats to her argument that the amendment impermissibly operates retroactively and that the voters did not know that the measure on which they were voting would take effect immediately. *See* Dkt. 96, at 30-42. These arguments are no more persuasive than they were in the context of Abrahamson's procedural due process claim. The amendment is not fundamentally retroactive, although it has a modest retroactive impact. Well-established Wisconsin law made clear that the amendment would be effective upon certification (even if here were some questions about the timing and manner of its implementation). Abrahamson and the voters had notice that the amendment could be implemented to remove Abrahamson from her position as chief justice. *See Atkins v. Parker*, 472 U.S. 115, 130 (1985) ("The claim that petitioners had a constitutional right to better notice of the consequences of the

statutory amendment is without merit. All citizens are presumptively charged with knowledge of the law."). Nor does this case really involve access to the polls, unlawful counting of votes, or refusal to effectuate the results of an election. In short, this case does not implicate the fundamental right to vote.

Wisconsin's decision to change the selection method for its chief justice in the middle of Abrahamson's term as justice is undoubtedly disappointing to her and her supporters. The decision may have been unwise, politically motivated, or even unfair to Abrahamson. But the decision to restructure the leadership of the court, immediately, cannot be called irrational, especially given the court's troubled recent history. Defendants are entitled to summary judgment on Abrahamson's substantive due process and equal protection claims.

## D. The voters plaintiffs' claims

The court would ordinarily forgo discussing the merits of claims that a plaintiff does not have standing to pursue. But, again for the sake of completeness, the voter plaintiffs' claims would not succeed for essentially the same reasons that Abrahamson's claims cannot survive summary judgment. The voter plaintiffs have not identified a protected interest that would entitle them to due process protections. Like Abrahamson, all they have alleged is an expectation that Abrahamson would serve as chief justice until 2019. And that expectation is more attenuated than Abrahamson's expectation, because Abrahamson herself could choose to leave the position of chief justice, or even leave the court itself. It would be a considerable expansion of federal due process protection to allow voters to sue their state governments whenever a state official ends up wielding less power than the voters initially anticipated. This is a conception of property far beyond anything contemplated in *Roth* or the cases cited

by plaintiffs. *See Roth*, 408 U.S. at 570 ("[T]he range of interests protected by procedural due process is not infinite.").

Moreover, the voter plaintiffs would have an even less persuasive argument regarding inadequate process than Abrahamson has. They participated in the April 2015 election, and they do not challenge its legitimacy. As defendants observe, the voter plaintiffs' verifying affidavits—dated the day *before* the election—confirm that they were keenly aware of the possibility that the new selection method would take effect immediately. *See* Dkt. 1, at 18-21.

Finally, the voter plaintiffs cannot demonstrate that Wisconsin lacked any rational justification for changing the method for selecting a chief justice or implementing it immediately.

CONCLUSION

This court has been asked whether the immediate implementation of an amendment to the Wisconsin Constitution concerning the structure of its court system offends the United State Constitution. Federal review of the action of a state—acting in its capacity as a sovereign government—is sharply limited, and the court does not require perfection of expression or purity of motive. The amendment passes constitutional muster, even if implemented immediately to remove Abrahamson from the position of chief justice.

ORDER

IT IS ORDERED that:

1. Defendants' motions to dismiss, converted into motions for summary judgment, Dkt. 45 and Dkt. 49, are GRANTED.

2. Defendant Ann Walsh Bradley's motion to take judicial notice, Dkt. 90, is DENIED as moot.

3. Plaintiffs' motion to strike, Dkt. 112, is DENIED as moot.

4. The clerk of court is directed to enter judgment in favor of defendants and to close this case.

Entered July 31, 2015.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge